James E. FOSTER, Appellant,

v.

Evelynn C. FOSTER, Appellee.

No. S–4927.

Supreme Court of Alaska.

Oct. 21, 1994.

James E. Foster, pro se.

Karla F. Huntington, Mendel & Huntington, Anchorage, for appellee.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. These benefits are actually payable under the Northern Alaska Carpenter's Retirement Fund and the Northern Alaska Carpenter's Defined

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J., pro tem.*

## OPINION

MATTHEWS, Justice.

In this divorce case all of the issues concern the division of the parties' property. Appellant, James Foster, contends that the court made a number of errors which, taken together, have resulted in a division of property grossly skewed in favor of the appellee, Evelynn Foster. We conclude that some of the court's findings are erroneous, that additional findings are needed, and that no judgment concerning whether the overall division of marital property was clearly unjust can be made until the erroneous findings are corrected and the necessary additional findings are made. We remand for these purposes and authorize the superior court to change the property division as required by the interests of justice in light of the corrected and additional findings.

James and Evelynn Foster were married in 1966. They separated in November of 1986. At the time of trial in September of 1991, Evelynn was forty-six and James was fifty-six. They have no minor children. James is unable to work and receives workers' compensation and disability payments. Evelynn works full time for the Alaska Native Health Services and earns approximately $1,500 per month. She has serious health problems, however, and the court found that she could not expect to work on a full-time basis much longer.

James' benefits include $2,000 per month from a workers' compensation settlement and $729 per month in social security disability payments. These payments will continue until his death. In addition, James will receive a lump sum payment of $40,000 in 1994 as part of the workers' compensation settlement. James receives monthly payments of $962.84 from his "Piledriver's Union"[1] pension. These payments will continue until his

Contribution Pension Plan. However, the parties and the superior court use the indicated terminology and we do so as well to avoid confusion.

or Evelynn's death, whichever occurs later. James is also entitled to receive between $500 and $600 per month for the rest of his life from an as yet undistributed pension administered by the Laborer's Union.

The parties own a house situated on three acres of land in Anchorage and a small amount of personal property. In addition, Evelynn owns 130 acres of unimproved land on the Parks Highway north of Anchorage which she obtained under the Alaska Native Allotment Act.

We reproduce the following table set forth in the trial court's findings which reflects the property distribution ordered by the court:

"Awarded to Mrs. Foster

| DESCRIPTION | VALUE |
| --- | --- |
| House and 3 acres | $98,000.00 |
| Piledriver's Union Pension; 100% of all benefits beginning December 1991. Including survivor rights. | $962.84/m |
| Laborer's Union Pension | 50% |
| Automobile | $4,500.00 |
| Cash received | $10,000.00 |
| Cash received | $5,000.00 |
| Native Land Claims separate property | (negligible) |

Awarded to Mr. Foster

| | |
| --- | --- |
| Union Pension; defined contribution | $3,057.00 |
| Piledriver's Union Pension; cash received through November 30, 1991. | $52,325.68 |
| Nabor's Drilling, cash received | $14,000.00 |
| [W]elding machine and truck | $13,000.00 |
| [H]ousehold furnishings (in home) | $3,000.00" |
| [Laborer's Union Pension | 50%][2] |

The court found that Evelynn's 130–acre Native allotment and James' workers' compensation settlement were separate property. The court also found that Evelynn's land had little or no value.

**2.** Although omitted at this point in the findings this was awarded to James. The omission clear-

The "cash received" amounts awarded to Evelynn, $15,000, and to James, $66,325.68, reflect cash which was marital property received by the parties after their separation in November of 1986. Except for small amounts still held at the time of trial, these funds had been spent and thus were not available for division.

James challenges the trial court's characterization and valuation of certain assets and the overall allocation of the marital property. We turn first to James' contentions concerning the specific assets.

### The Welding Machine and Truck

Although the welding machine and truck are separate items of personal property, the court valued them together at $13,000. James testified that the truck was worth approximately $2,000 and that he sold the welding machine for $1,500. At trial, James submitted two 1988 appraisals valuing the truck at $1,500 and $2,200 to $2,500 and welder at $200 and $300 to $500. Evelynn submitted evidence showing that a similar truck in average condition was worth $7,200. She did not testify regarding the condition of this particular truck. Without stating its reasons, the trial court concluded that the value of the truck and the welding machine together was $13,000. There is no evidence to support the court's finding and it is thus clearly erroneous. On remand the truck and welder should be valued in accordance with the evidence.

 Ordinarily, marital property should be valued as close to the time of trial as possible. *Ogard v. Ogard,* 808 P.2d 815, 819 (Alaska 1991). The date that the marriage has ceased to function as a single economic unit, often the date of separation, is the date after which newly acquired property should be considered non-marital property. *Id.* Where marital property is sold subsequent to the parties' separation but prior to trial, the sale proceeds should retain their character as marital property. However, if the proceeds are then spent for a marital purpose or nec-

ly was an oversight.

## 400

essarily expended for normal living expenses, they need not be taken into account in the final property division. Brett R. Turner, *Equitable Distribution of Property* § 8.15, at 374 (Cum.Supp.1993). Where there is evidence that a marital asset was dissipated, wasted, or converted to a non-marital form, the court can "recapture" the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset. *Jones v. Jones,* 835 P.2d 1173, 1176 (Alaska 1992); *Oberhansly v. Oberhansly,* 798 P.2d 883, 885 (Alaska 1990); *Hartland v. Hartland,* 777 P.2d 636 (Alaska 1989); *Pattee v. Pattee,* 744 P.2d 658, 661–62 (Alaska 1987); *Brooks v. Brooks,* 677 P.2d 1230, 1232 (Alaska 1984). In assigning value to the truck and welding machine on remand, the court should apply these principles.

### The Anchorage Residence

■ The court valued the parties' residence at $98,000. James argues that the property is worth at least $120,000 based on an appraisal done shortly before trial. His argument, however, does not take into consideration the mortgages on the property totalling approximately $22,000. James recognized the existence of the mortgages when he testified at trial. Further, James' counsel acknowledged that the equity in the home was approximately $100,000 rather than $120,000. We conclude, therefore, that the court did not err in valuing the equity of the residence at $98,000.

### The Piledriver's Union Pension

The Piledriver's Union pension pays $962.84 per month for the joint lives of James and Evelynn. At the time of trial James had already received $52,325.68 from the pension.[3] The trial court credited him with receiving this sum and awarded Evelynn all future payments.

■ James argues that this pension should not have been considered marital property since it is based on his disability rather than his earnings and length of service. Evidence from the pension administrator, however, indicates that the benefits are true retirement payments rather than payments on account of disability. Therefore, the court's determination that the pension is marital property is not clearly erroneous.

■ The court erred, however, in "recapturing" the payments which had been made to and spent by James before trial without making findings that circumstances existed which warranted their recapture. Our discussion of this point concerning the welding machine and truck also governs here. We also note that the trial court did not value the pension. It is impossible to judge the overall fairness of the property distribution unless the amount of the income stream awarded to Evelynn is reduced to present value.[4] On remand, the trial court should make findings on both of these issues.

### The 130–Acre Native Allotment

■ Evelynn owns a 130–acre parcel of unimproved property bisected by the Parks Highway. She obtained this property under the provisions of the Alaska Native Allotment Act of 1906, 34 Stat. 197 (formerly codified at 43 U.S.C. §§ 270–1 (1970), repealed with savings clause under the Alaska Native Claims Settlement Act, 43 U.S.C. § 1617). The purpose of the Alaska Native Allotment Act was to provide a means by which individual Alaskan Natives could obtain title to the lands they occupied. *United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009, 1015 (D.Alaska 1977), *aff'd* 612 F.2d 1132 (9th Cir.1980). Allotments can be sold, although the Secretary of the Interior must approve their sale to insure that each transaction is fair. 43 C.F.R. § 2561.3 (1993); David S. Case, *Alaska Natives and American Laws* 152 (1984). When sold, the buyer

---

**3.** The first payment James received on this pension was $24,411.81 in May of 1989. Subsequent payments were in the indicated monthly sum.

**4.** Assuming for purposes of illustration a 32–year life expectancy for Evelynn and a seven percent discount rate, the 1991 value of the Piledriver's pension awarded to Evelynn was approximately $146,000. We emphasize that this figure is merely an illustration. The trial court should determine the appropriate discount rate and life expectancy based on the evidence presented by the parties.

receives unrestricted title to the land. Case, *supra* at 152. Evelynn's allotment was confirmed by the Bureau of Land Management on March 1, 1989. Decision of Bureau of Land Management regarding Native Allotment Application AA–7791 (Mar. 1, 1989). Although Evelynn filed for the allotment in April of 1972, the allotment related back to her initial occupancy in August of 1964, two years prior to the parties' marriage. *Id.; see also State of Alaska, Dep't of Transp. & Pub. Facilities*, 125 IBLA 291, 294–95 (1993). The confirmation of Evelynn's allotment was appealed by the State of Alaska and, at the time of the trial, the case had been submitted to the Interior Board of Land Appeals and was pending decision.[5]

James claims that the allotment should be regarded as marital property. Alternatively, he claims that if it is not marital property he should be awarded some amount in recognition of his services in improving the property and that the value of the property should be taken into account in assessing Evelynn's financial status. Further, James argues that the court erred in determining that the property was of negligible value.

■ Courts dealing with Indian allotments under the Indian General Allotment Act of February 8, 1887, 24 Stat. 388 (codified as amended in part at 25 U.S.C. §§ 331–34, 339, 341, 342, 348, 349, 354, 381 (1983)), applicable to the lower forty-eight states, have held that property acquired as an allotment is separate property, even when acquired during marriage, and that state courts lack the authority to adjudicate title to such

property or to order its transfer. *In re Marriage of Wellman*, 258 Mont. 131, 852 P.2d 559 (1993); *Sheppard v. Sheppard*, 104 Idaho 1, 655 P.2d 895 (1982). We agree with these authorities and thus affirm the trial court's determination that the allotment was the separate property of Evelynn.[6]

■ James also argues that the court should have awarded him the value of the work which he performed over the years to augment the value of the allotment. In *Sheppard* the Supreme Court of Idaho permitted a recovery in a divorce context of one party's share "of the community contributions that have gone into [allotment] property." 655 P.2d at 914. There is, however, no factual basis for the application of such a rule in this case. While James did some work on the property, there was no evidence that the improvements made by James added to the fair market value of the property.[7]

■ James argues that if the allotment is not marital, at least its value as Evelynn's separate property should be taken into account in assessing her overall financial condition and thus her need for a greater than equal share of marital property. No authority is cited by Evelynn which suggests that the allotment should not be considered on the question of her financial condition. It is our view that the allotment should have been so considered.[8] Failing to do so carries a risk of accepting a distorted and inaccurate view of the relative economic positions of the parties.[9]

5. Subsequently, on March 9, 1993, the Interior Board of Land Appeals rejected the State's appeal. *State of Alaska, Dep't of Transp. & Pub. Facilities*, 125 IBLA 291 (1993). The Board granted reconsideration but affirmed its decision without modification. The record does not indicate whether the State continues to challenge the allotment.

6. *See Heffle v. State*, 633 P.2d 264 (Alaska 1981) (state courts lack jurisdiction to decide ownership conflict relating to Native allotment land).

7. At trial, both James and Evelynn testified that James worked on the property intending to improve the land. James constructed two iron gates across a roadway leading to the property, built a culvert on the property, and cleared a road in anticipation of building a home on the land. However, at the time of trial all of the

improvements were in a state of disrepair and were not considered by an appraiser to have increased the value of the property.

8. The financial condition of the parties is one of the statutory factors which should be considered in dividing marital property. AS 25.24.160(a)(4)(D).

9. The court took into account James' separate property (the workers' compensation settlement and his social security payment) in determining that Evelynn should have the bulk of the marital property. By failing to consider Evelynn's separate property as well, the court could not accurately assess the relative economic positions of the parties.

James' final argument concerning the allotment is that the court erred in concluding that its value was negligible. James presented an appraisal and testimony that the fair market value of the property was $137,700. Both were based on the assumption that Evelynn owned and would be entitled to sell all of the property. The validity of this assumption was in doubt as of the time of the trial because of the State's administrative appeal. No evidence as to the value of the property was submitted at trial because of the uncertainty caused by the appeal.

 In our view the trial court committed clear error in determining that the allotment had a negligible value. There was no evidence supporting this conclusion. The trial court should have notified the parties of this evidentiary void and required that evidence be submitted. *See Root v. Root,* 851 P.2d 67, 69 (Alaska 1993) (court should direct parties to supply evidence concerning value of significant assets). On remand, the court should make findings concerning the value of the allotment property based on the evidence submitted and take this into account in assessing the relative economic positions of the parties.

We now turn to James' arguments pertaining to the trial court's overall allocation of the marital property.

*The Overall Allocation of Marital Property*

James argues that the overall allocation of marital property was unjust. He contends specifically that heavily weighting the division in favor of Evelynn was erroneous because Evelynn is ten years younger than he, holds a full-time job, is a high school graduate with at least one year of college, and has free medical care as an Alaska Native. He, in contrast, is totally disabled, has only a seventh grade education, and must pay for much of his medical care.

 Trial courts have broad discretion in dividing the property of divorcing parties. *Laing v. Laing,* 741 P.2d 649 (Alaska 1987). Such a division must be just, AS 25.24.160(a)(4), and will only be disturbed on appeal if it is clearly unjust. *Root,* 851 P.2d at 68. In determining a just division the trial court must consider a number of factors which are enumerated by statute.[10] Those pertinent here relate to the age and health of the parties, their earning capacity, educational background, employment skill, financial condition including availability and cost of health insurance, and the general circumstances and necessities of each party.

The trial court generally addressed these factors, stating that the reason for its allocation in favor of Evelynn was "because of the parties' economic positions and their needs in the future." The court noted that Evelynn

10. AS 25.24.160(a)(4) requires consideration of the following factors:

(a) In a judgment in an action for divorce ... the court may provide
 ....
(4) for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it; ... the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:

(A) the length of the marriage and station in life of the parties during the marriage;
(B) the age and health of the parties;
(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
(D) the financial condition of the parties, including the availability and cost of health insurance;
(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
(G) the circumstances and necessities of each party;
(H) the time and manner of acquisition of the property in question; and
(I) the income-producing capacity of the property and the value of the property at the time of division.

was forty-one percent disabled and was with great difficulty making only $1,500 per month. The court found that "her present ability to work is quite tenuous. Her financial situation for the future is quite insecure; her future income is very doubtful.[11] She has almost no cash." In contrast, the court found James' "financial situation for the future is quite secure based on [his social security and workers' compensation benefits].... Evidence indicates that he has some cash presently and the Court finds that he is likely to have much more cash than that."

The only statutory factor identified by James that was not explicitly addressed by the trial court was the cost of health insurance for James. On remand, the court should take this into account.[12]

What remains is James' argument that the property division is so heavily weighted in favor of Evelynn that it is clearly unjust. As the case stands this is an argument of some force. It appears that Evelynn has received marital property which is valued at approximately $280,000.[13] By contrast, James' award, including his half of the Laborer's pension and considering only property actually available for division as of the time of trial, is likely to be less than $50,000.

We have held that the norm in dividing marital property is an equal division. *Gabaig v. Gabaig*, 717 P.2d 835, 842 (Alaska 1986). However, deviations from this norm are permitted where justified by consideration of relevant factors. It would be premature to rule at this time whether the court's analysis of relevant factors justifies the property division it ordered. Instead, we remand this case to the trial court with instructions to redetermine the value of the truck, welder, and allotment in accordance with the evidence, to consider whether recapture of the marital assets which had been expended before trial is warranted, to place a present value on the Piledriver's and Laborer's pensions, and to make explicit findings concerning the cost of health care to James. If, in light of these changes, the court believes that an adjustment of the division of property should be made, the court is authorized to make it.

REVERSED and REMANDED.[14]

---

11. James challenges this finding as clearly erroneous. However, three physicians testified concerning Evelynn's mental and physical state. The cumulative effect of this evidence can be reasonably interpreted to mean that Evelynn probably could not expect to continue to work on a full-time basis in the future. The trial court's finding on this point is therefore not clearly erroneous.

12. The trial court need not make findings on all the statutory factors so long as it addresses the factors which are germane to the particular case. *Laing v. Laing,* 741 P.2d 649, 652 (Alaska 1987).

13. This assumes that the Laborer's pension is worth some $72,000 based on a $550 per month pay-out for a 21 year period (James' life expectancy) and a seven percent discount. These assumptions, again, are for illustrative purposes only. *See* note 4, *supra.*

14. We retain jurisdiction to save the parties' expense and delay in the event that either party is dissatisfied by the rulings made by the trial court on remand.