Sharon L. STEVENS, Appellant/Cross–Appellee

v.

Ronald A. STEVENS, Appellee/Cross–Appellant.

Nos. S–13379, S–13420.

Supreme Court of Alaska.

Oct. 14, 2011.

Peter F. Mysing, Kenai, for Appellant/Cross–Appellee.

David S. Houston, Houston & Houston, PC, Anchorage, for Appellee/Cross–Appellant.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

PER CURIAM.

## I. INTRODUCTION

Ronald and Sharon Stevens separated in August 2006, ending a 40–year marriage. In June 2007 they appeared before the superior court for their divorce trial. Before the trial ended, the parties entered into what they thought was a settlement on the property division issues. But the parties could not agree on the exact terms of the settlement, and in August 2008 they returned to the superior court for a second day of trial on the property division issues. The superior court valued the property, equitably divided the estate, and ordered each side to pay his or her own attorney's fees. Pertinent to this appeal, the trial court valued the parties' two residences as of the date of the first day of trial. Sharon appeals and Ronald cross-appeals. We conclude that it was error for the superior court to value the real property as of the date of the first day of trial when the second and final trial day occurred over a year later. We therefore reverse and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Background Information

Ronald and Sharon were married on June 8, 1966, and separated on August 8, 2006. Ronald had completed college and Sharon had a high school education. During the marriage Ronald served 27 years in the United States Air Force and retired, after which he worked as a civil service employee for more than 12 years. He is retired from the civil service. Sharon was primarily a housewife but also worked various jobs during the marriage.

At the time of trial, Ronald was 62 years old and Sharon was 60 years old. Ronald

testified at trial that he was in good health. Sharon testified to many health problems including arthritis, two strokes that left her partially blind, high cholesterol, high blood pressure, and compressed discs in her neck. She testified that she was unable to work due to her health problems and that she was ineligible for Social Security Disability payments. Apart from her own testimony, she did not present other evidence regarding her health problems.

At the time of separation Ronald and Sharon had substantial marital assets. Ronald had accumulated a thrift savings plan (TSP) account worth approximately $200,000. They owned two homes, one in Arizona and one in Alaska. The Alaska home was free of debt, but the Arizona home had a mortgage that Ronald and Sharon had taken out in order to improve the Alaska home. They owned two vehicles, a Dodge truck and a Chevy Silverado.

At the time of trial, Ronald received approximately $3,400 a month from his military and civil service retirement accounts. Ronald also worked for his son's start-up business, earning approximately $1,000 a month. He was eligible for Social Security payments of $1,400 a month but had not elected to take the benefits. Sharon was not working outside of the home and would become eligible for Social Security payments in July 2010.

### B. Procedural History

On August 8, 2006, Ronald and Sharon separated after Sharon filed a petition for an ex-parte domestic violence protective order in the district court in Kenai. The district court issued an ex-parte 20–day domestic violence protective order against Ronald. At the time, the parties had a Bank of America bank account and an Alaska USA Federal Credit Union bank account, with $28,461 split approximately equally between the two accounts. The district court did not provide for the payment of marital bills, but it awarded Sharon possession of the Alaska USA account.

On August 24, 2006, the district court held a hearing and entered a long-term domestic violence protective order. In its long-term protective order, the district court ordered Ronald to pay Sharon $1,000 a month in spousal support until an order was issued in the divorce case. At the time, Ronald was receiving $3,400 per month from his pensions. There was little discussion of property at the long-term domestic violence hearing.

After the district court entered the long-term protective order, Ronald, without informing Sharon, removed nearly all of the $28,461 from the joint accounts. Between August 2006 and June 2007 Ronald also collected approximately $32,250 in retirement income. During this period, Ronald used $10,000 of the money from the joint bank accounts and the retirement funds to pay Sharon $1,000 a month in support. He also used the money from the joint bank accounts and from his retirement income to pay at least $27,443 in marital debts. Because Sharon had no income besides the $1,000 a month in interim support Ronald was paying her, she accumulated more than $22,000 in credit card debt.

On June 8, 2007, Ronald and Sharon came before the superior court for trial. After they both testified, the parties met and agreed on a settlement. According to this oral agreement, Ronald would get possession of the Arizona home, valued at $285,000, and Sharon would get the Alaska home, valued at $192,000. Sharon would receive all the personal property in the Alaska home and the Silverado, and Ronald would receive all the personal property in the Arizona home and the Dodge. Ronald's retirement income would be split equally, and Sharon would receive 55% of the marital estate. Both parties agreed that this agreement was fair "with a few exceptions."

The parties never memorialized their settlement in writing. Although both parties contended that there was a settlement, they disagreed as to what the settlement actually was. In March 2008 Ronald withdrew his contention that there was a settlement and the court scheduled the trial to resume on August 6, 2008.

In the meantime, on May 30, 2008, the parties entered into a stipulation on the valuation and distribution of their property. Ac-

cording to the stipulation, Ronald would get the Arizona home and Sharon would get the Alaska home. The parties agreed to value and divide all of their personal property through a blind bidding process using two lists: an "undisputed property list" and a "disputed property list." Under the blind bid process, both parties would bid on the items on the disputed property list and whoever bid the highest price would receive the item at that price. The parties' two vehicles were listed on the disputed property list, and Ronald bid on both of them. Sharon did not bid on the vehicles; instead she crossed the vehicles off the disputed list and noted: "drop from bid list; part of undisputed property." The superior court created a compilation of the two bids, and the court designated the two vehicles as "undisputed."

On August 6, 2008, Ronald and Sharon came before the superior court for a second day of trial to resolve the remaining issues that they had been unable to agree on. Ronald argued that the superior court should value the real property as of the second day of trial, not the first day of trial. The value of the Arizona home had dropped from $285,000 to $245,000 between June 2007 and August 2008. The value of the Alaska home had increased from $192,000 to $197,600.

Ronald also argued that the court should distribute the vehicles according to the blind bid process, in other words, that he should receive both vehicles because he was the only party who had bid on them. Sharon argued that the court should order Ronald to repay her, in cash, half of the $28,461 ($14,230) that he withdrew from their joint accounts in August 2006. She argued that the court should award her 60% or 55% of the marital estate or, alternatively, award her spousal support. She also sought an award of attorney's fees.

On September 11, 2008, the superior court issued written findings of fact and conclusions of law. The court first valued the two homes using their June 2007 appraised values. The court then divided Ronald's retirement income equally, with each party receiving $1,700 a month. It distributed the $32,250 in retirement income that Ronald collected during their period of separation according to the amount that the parties actually received, with Ronald receiving $22,250. The court thus allocated to Sharon $10,000 for the support she received from Ronald during their separation. The court disregarded Ronald's bid on the vehicles and awarded the Silverado to Sharon and the Dodge to Ronald using their June 2007 values.

The court also found that both parties were in "essentially similar economic circumstances" because they were of similar age and because Ronald's retirement income was split equally. It therefore equally divided the marital estate, with each party getting $385,351.50 in assets. Each party received approximately $100,000 from the TSP account. The court noted that Sharon had medical problems but found that they were not of sufficient severity to warrant unequal distribution. It found that spousal support was unnecessary because both parties were "economically viable and capable of self support." It finally denied Sharon's request for attorney's fees.

Sharon appeals and Ronald cross-appeals.

## III. DISCUSSION

 The superior court has broad discretion to divide marital property.[1] "Equitable distribution of marital assets by the superior court involves a three-step procedure. First, the trial court must determine what specific property is available for distribution. Second, the court must find the value of this property. Third, it must decide how an allocation can be made most equitably."[2] Ronald appeals the superior court's valuation of the marital homes. Sharon appeals the superior court's decision not to award attorney's fees. Both parties appeal various portions of the court's equitable division of property.

---

**1.** *Hatten v. Hatten,* 917 P.2d 667, 671 n. 9 (Alaska 1996) (citing *Bays v. Bays,* 807 P.2d 482, 485 n. 4 (Alaska 1991)).

**2.** *Edelman v. Edelman,* 3 P.3d 348, 351 (Alaska 2000) (citing *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983)).

## A. Standard Of Review

The trial court's determination of which date to use for purposes of valuing property is reviewed for an abuse of discretion.[3] "The valuation of available property is a factual determination that should be reversed only if clearly erroneous."[4] A valuation is clearly erroneous if we are left with a definite and firm conviction on the entire record that a mistake has been made.[5] The superior court has broad discretion to equitably divide the property between the parties in a divorce.[6] We review the superior court's equitable division for abuse of discretion and will reverse the court's division only if it is clearly unjust.[7]

The award of attorney's fees in a divorce action rests within the broad discretion of the superior court, and will not be disturbed on appeal unless it is "arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[8]

## B. It Was Error To Use The June 2007 Trial Date As The Valuation Date.

Ronald argues that the superior court erred in using the first trial date (June 8, 2007) to value the marital property instead of the second trial date (August 6, 2008). Ronald presented evidence to the superior court that the value of the Arizona home had dropped over 15% between 2007 and 2008. Furthermore, the delay between the first and second trial dates was over a year long, and there was a discrete event—the widespread national housing market crash—that reduced the Arizona home's value. He argues that he was unfairly charged with the loss in the value of the Arizona home that occurred during the proceedings and that Sharon received an unexpected windfall in the appreciation of the Alaska home. Sharon argues that the superior court did not clearly err in using the June 2007 valuation date because it made specific findings as to why it used the earlier date.

Alaska Statute 25.24.160(a)(4)(I) instructs the court to consider, in addition to other factors, "the value of the property *at the time of division*" when dividing property. We held in *Cox v. Cox* that "while the date for classification of property is that of separation, the proper date for valuation is one as close as practicable to that of trial."[9] (Other jurisdictions also hold that the date of trial is normally the proper date for valuation.[10]) The superior court should choose the valuation date that "will provide the most current and accurate information possible and which avoids inequitable results."[11] We noted in *Ogard v. Ogard* that there are situations where the superior court may use the date of separation as the valuation date, but it must first make specific findings before doing so.[12]

In its order, the superior court acknowledged and cited *Ogard*,[13] but it also stated:

---

3. *Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991); *Hunt v. Hunt*, 698 P.2d 1168, 1172 (Alaska 1985).

4. *Haines v. Cox*, 182 P.3d 1140, 1143 (Alaska 2008) (quoting *Cox v. Cox*, 882 P.2d 909, 913–14 (Alaska 1994)).

5. *Sloane v. Sloane*, 18 P.3d 60, 64 (Alaska 2001).

6. *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009) (citing AS 25.24.160(a)(4) and *Nicholson v. Wolfe*, 974 P.2d 417, 421 (Alaska 1999)).

7. *Id.* (citing *Brotherton v. Brotherton*, 941 P.2d 1241, 1244 (Alaska 1997)).

8. *Koller v. Reft*, 71 P.3d 800, 808 (Alaska 2003) (quoting *Zimin v. Zimin*, 837 P.2d 118, 124 (Alaska 1992)).

9. 882 P.2d 909, 917 (Alaska 1994) (citing *Ogard v. Ogard*, 808 P.2d 815, 819 n. 8 (Alaska 1991)).

10. *See* 2 Brett R. Turner, Equitable Distribution Of Property § 7.4, at 621 (3d ed.2005).

11. *Ogard*, 808 P.2d at 819 (quoting L. Golden, Equitable Distribution of Property § 7.01, at 207 (1983)).

12. *Id.* at 820.

13. This case differs slightly from *Ogard* because here the superior court did not use the separation date as the valuation date. Instead, the court used the earlier of two trial dates. We hold that the *Ogard* analysis also applies to such situations. In other words, trial courts should generally use the valuation date "which will provide the most current and accurate information possible," typically the later trial date. *Ogard*, 808 P.2d at 819. The court may, however, use the earlier trial date if it makes specific findings on why it did so, *id.* at 820, provided that its reason is consistent with the principles we elucidate in our case law.

[I]t is most equitable, under the facts of this case, to use the first day of trial as the valuation date so as not to award or punish either party for the failure of their settlement agreement. Use of the June 8, 2007, date puts both parties in the same position they were in when the first date of trial ended as the result of an announced settlement that was later withdrawn.... The parties should not be deterred from trying to [settle] the case during trial by the concern they will have to use different property values if settlement efforts fail.

In choosing to use the property values from the first day of trial, the superior court made explicit findings on why it chose this earlier date. Our task is to determine if the court abused its discretion by selecting the earlier date for an impermissible reason.

We have held that the superior court's use of the date of separation as the valuation date was not an abuse of discretion where one party had dissipated marital assets,[14] where there was active appreciation of marital assets,[15] and where the parties did not present evidence of a later valuation[16] or object to the superior court's use of the earlier date.[17] In *Heustess v. Kelley–Heustess*, we held that the superior court abused its discretion by using the separation date as the valuation date because of one party's deceptive yet harmless conduct.[18]

■ In *Ogard v. Ogard*,[19] we established the rule that marital assets should be valued on the date of trial. We based this rule on

the principle that "[a] valuation date should be chosen which will provide the most current and accurate information possible and which avoids inequitable results."[20] We noted in *Ogard* that, "[t]he choice of the later date is well supported by authority from other jurisdictions,"[21] and our own decisions after *Ogard* have cemented the rule. For example, in *Moffitt v. Moffitt*,[22] we expanded the *Ogard* rule to a situation where the trial court was directed to value the parties' marital business and its goodwill upon remand after a first appeal. There, we concluded that the trial court should use the date of the remand hearing to determine the value and marketability of the business and its goodwill. We reasoned that "the same considerations discussed in *Ogard* appl[ied] ... [t]hat is, in general, the later date best 'advances the interests of accuracy and fairness.' "[23] In *Adrian v. Adrian*, we again emphasized this goal, noting that the "underlying premise of our decision in *Ogard* is that the goal is to arrive at an income figure reflective of economic reality."[24]

■ There are limited exceptions to the *Ogard* rule. In *Ogard*, we listed two possible exceptions: (1) where "one of the spouses dissipates assets or deliberately allows their value to decline following separation," or (2) where "the value of marital property increases due to the efforts of one of the spouses."[25] In the cases in which we have allowed the use of an earlier and less accurate valuation date, one spouse has either dissipated marital

14. *Foster v. Foster*, 883 P.2d 397, 399–400 (Alaska 1994).

15. *Brown v. Brown*, 914 P.2d 206, 208 (Alaska 1996); *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1012 (Alaska 1995).

16. *Brotherton v. Brotherton*, 941 P.2d 1241, 1245 (Alaska 1997).

17. *Odom v. Odom*, 141 P.3d 324, 336 n. 48 (Alaska 2006).

18. 158 P.3d 827, 832 (Alaska 2007). This court held that the husband's deception in separating immediately after refinancing the marital residence was not "financially harmful" and did not justify defeasing his interest in its appreciation. *Id.*

19. 808 P.2d 815 (Alaska 1991).

20. *Id.* at 819.

21. *Id.* Courts in other jurisdictions frequently require updated valuations in order to avoid applying stale data. *See, e.g., McDiarmid v. McDiarmid*, 649 A.2d 810, 812–13 (D.C.1994).

22. 813 P.2d 674 (Alaska 1991).

23. *Id.* at 678 (quoting *Ogard*, 808 P.2d at 819).

24. 838 P.2d 808, 811 (Alaska 1992).

25. *Ogard*, 808 P.2d at 820 (quoting Lawrence J. Golden, Equitable Distribution of Property § 7.02, at 208 (1983)).

assets[26] or caused their value to appreciate through individual efforts.[27] In addition, we have occasionally approved an earlier valuation date where a later valuation date was less reliable.[28] These "reliability" cases do not present true exceptions to the principles of accuracy underlying *Ogard* because in these cases the more accurate valuation was the earlier one. In our many decisions applying the *Ogard* rule we have limited the exceptions to the two described in *Ogard*.

Neither of the two exceptions contemplated in *Ogard* applies in this case. Here, the trial court allowed the use of admittedly less accurate valuation data to create incentives toward settlement. While promoting settlement is a worthy goal, none of the many jurisdictions that favor the use of the most current valuation date appear to recognize an exception to encourage settlement.[29] Moreover, it is not clear how using the earlier valuation date in this case could actually have promoted settlement. Between the date of separation and the date of trial, the value of marital assets such as real estate always has the potential to fluctuate with the market.[30] And neither spouse can know how real estate prices will change in the future.

The trial court's stated purpose of avoiding "a situation whereby somebody sort of gains an advantage by the delay in this case" seems irrelevant where there was no finding that either party was trying to delay or manipulate the trial date in order to receive a valuation advantage. The trial court characterized its decision as designed "not to [re]ward or punish either party for the failure of their settlement agreement," but Sharon was rewarded and Ronald punished by the court's selection of the earlier valuation date.[31] By varying from the *Ogard* rule and choosing the earlier date, the trial court assigned the Arizona home an artificially high value that had no basis in reality at the time the division was to take place.

Turner's *Equitable Distribution of Property* states "the mere fact that time has passed between the date of trial and date of decision does not alone require revaluation."[32] But Turner goes on to explain that when the value of an asset changes, even *after* the date of the trial but before the trial court's decision has become final, it is appropriate for the trial court to determine whether revaluation is appropriate. When revaluation is requested, "the trial court must evaluate the likelihood and amount of the change involved against the administrative costs of receiving new evidence...."[33] And Turner adds that "[t]he important fact is the amount of the change in value, not the extent of the delay in time."[34] Here, the change in value was significant; it exceeded the 15% threshold we use to demonstrate a material change in cir-

**26.** *See, e.g., Foster v. Foster,* 883 P.2d 397, 399–400 (Alaska 1994).

**27.** *See, e.g., Brown v. Brown,* 914 P.2d 206, 208 (Alaska 1996).

**28.** *See, e.g., Henderson v. Henderson,* Mem. Op. & J. No. S–9725, 2002 WL 844717, at *1–2 (Alaska, May 1, 2002) ("Here, we find no clear error in Judge Reese's acceptance of the appraisal as the most reliable estimate of the home's fair market value.").

**29.** *See* Brett R. Turner, *Determining the Date for Valuing Marital Property in Divorce Actions,* 13 No. 2 DIVORCE LITIG. 17 (2001).

**30.** 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY 3D § 7:4, at 635 (3d ed. 2005) ("Fluctuation in the value of the marital home is usually caused by market forces, and only rarely caused by the efforts of the possessing spouse."); *see also Sutliff v. Sutliff,* 518 Pa. 378, 543 A.2d 534, 537 (1988) ("Volatile market conditions and changing economic circumstances can render assets that had been valuable months or years earlier virtually worthless in the present, and vice versa. Publicly traded securities may be worth a fortune one day, and a pittance the next. Privately owned business interests may be valued as a gold mine, or as a scrimption, depending on the times. Automobiles that were once of considerable worth may, through abuse or neglect, rapidly become valueless. Other examples too numerous to mention scarcely require enumeration.").

**31.** Some courts have used an earlier valuation date specifically for the purpose of punishing one party. *See, e.g., Oaks v. Cooper,* 536 Pa. 134, 638 A.2d 208, 212–13 (1994).

**32.** 2 TURNER, *supra* note 30, § 7:6, at 645.

**33.** *Id.* § 7:6, at 642.

**34.** *Id.* § 7.6, at 645.

cumstances for child support purposes.[35]

Turner, in his journal *Divorce Litigation,* has also noted that "[i]f the hearing lasts more than one day, the date of valuation is the last day on which evidence is presented." [36] Turner acknowledges that the decision whether to revalue an asset after the date of trial is generally a matter committed to the trial court's discretion, but he notes that, "[o]ver the past ten years, the appellate courts have become materially more willing to find that revaluation is required." [37] According to Turner, "[t]he cases holding that revaluation was required have tended to involve situations in which one year or more passed between the hearing and decision, situations in which specific proven post-hearing events changed the value of marital property, or situations in which significant marital assets had an unusually volatile value." [38] Indeed, in the 2010–2011 supplement to his treatise issued in November 2010, Turner adds language pointing out that *"[t]he sharp recession beginning in the fall of 2008 is likewise strong evidence of the importance of basing all divisions of property upon updated values,* and of reconsidering non-final orders when necessary to ensure that the division is based upon the most current financial information possible." [39]

The principle of *Ogard* controls the result in this case. Under the circumstances of this case, the trial court should value the property as of the later trial date. The court's valuation determination is reversed and the case is remanded for further proceedings consistent with this opinion. On remand, the parties should produce evidence of the properties' current values.[40]

**C. The Superior Court Did Not Err In Dividing The Property.**

**1. The vehicles**

Ronald argues that the superior court erred in failing to distribute the parties' two vehicles according to the blind bid process along with the rest of their personal property. Because Sharon did not bid on the items, Ronald argues that he should have received both vehicles through the blind bid process. He also argues that the superior court erred by failing to make findings on why it chose the June 2007 date to value the vehicles instead of a more recent valuation date.[41]

In this case, the parties had stipulated to two lists: an "undisputed property list" and a "disputed property list." Under the stipulation, the parties would each bid on the items on the disputed property list, and the party making the highest bid would receive the item at that price. The vehicles were not on the undisputed property list. The vehicles were on the disputed list, but only Ronald bid on them. Thus, under the stipulated agreement Ronald should have received both vehicles.

But the parties had also previously agreed during settlement talks on the first day of trial that Sharon would receive the Silverado and Ronald would receive the Dodge. During the blind bidding process, Sharon evidently thought that this agreement was still in place because she crossed out the entries for the cars on the disputed property list with the notation "drop from bid list; part of undisputed property." Sharon also contended at the second day of trial that she viewed them as "non-biddable items."

**35.** *Flannery v. Flannery,* 950 P.2d 126, 132 (Alaska 1997).

**36.** Turner, *supra* note 29.

**37.** 2 TURNER, *supra* note 30, § 7:6, at 642–43.

**38.** *Id.* § 7:6, at 643–44.

**39.** *Id.* § 7:6, at 262 (3d ed. Supp.2010) (emphasis added).

**40.** *See Moffitt v. Moffitt* 813 P.2d 674 (Alaska 1991).

**41.** Ronald also argues that the superior court abused its discretion because he did not have notice that he needed to present additional information on the value of the vehicles. The superior court stated at the start of the second day of trial that the vehicles would be valued at their June 2007 value. Our reaffirmance of the *Ogard* principle as it relates to the proper valuation date for the parties' real property applies equally to the valuation date of their vehicles. On remand the trial court should use the current value of the vehicles if there is current valuation evidence admitted.

The superior court agreed with Sharon and listed in its combined property sheet that the vehicles were "non-biddable." In its order, the superior court noted that the parties had originally agreed as part of their early settlement efforts that Sharon would receive the Silverado and Ronald would receive the Dodge. The court ruled that the vehicles should be distributed using the June 2007 values according to this arrangement, stating that "[d]istributing the vehicles in this manner place[d] the parties in exactly the same situation they were in on the first day of trial."

Generally, stipulations on valuation[42] and division of property[43] are binding between the parties. "Insofar as an agreement relates to the division of property, the separation agreement should be controlling in the absence of fraud, duress, concealment of assets or other facts showing that the agreement was not made voluntarily *and with full understanding*."[44] But it is not clear that both parties actually agreed that the two vehicles were to be included on the disputed list, or that Sharon had a full understanding of how the vehicles were to be treated. Given the apparent confusion about whether the vehicles were to be considered "disputed property" for the purposes of the blind bidding process and the parties' earlier agreement regarding the allocation of the two vehicles, we cannot say that the superior court abused its discretion in failing to distribute both vehicles to Ronald under the blind bid process.

## 2. Sharon's $10,000 in interim spousal support

Sharon argues that the superior court erred in its final allocation of the marital estate by allocating to her as marital property the $10,000 in interim support payments she received from Ronald from September 2006 to June 2007, as he was ordered to pay by the district court. She argues that the superior court's division improperly made the interim support payments part of the marital property.[45]

In its order, the superior court found that Ronald paid Sharon $10,000 in spousal support from his retirement income and their joint funds. It also ruled that Sharon would receive $10,000 in the court's final allocation of the estate, which reflected the money she actually received. The superior court explained that it had the discretion to "reallocate where necessary the monies awarded ... and/or give credit for marital expenses paid" by the district court because the district court's property order was issued primarily during an ex-parte domestic violence proceeding.

We have held several times that spousal support is separate and distinguishable from marital property.[46] In *Lewis v. Lewis* we held that, because alimony is not a property settlement, the superior court erred in treating the interim support as marital property without providing an explanation for why it did so.[47]

Our review of the superior court's order convinces us that it did not impermissibly treat Sharon's interim support as marital property. Central to our holding is the fact that it was the district court, not the superior court, that awarded Sharon the interim spousal support during a domestic vio-

**42.** *Lacher v. Lacher*, 993 P.2d 413, 422 (Alaska 1999); *Musser v. Johnson*, 914 P.2d 1241, 1242 (Alaska 1996). *See generally,* Turner, *supra* note 30, § 7.11, at 663.

**43.** *Jordan v. Jordan*, 983 P.2d 1258, 1264 (Alaska 1999).

**44.** *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996) (internal citations omitted) (emphasis added).

**45.** Sharon also argues that the superior court erred in finding that Ronald paid Sharon with retirement income instead of with the parties' joint bank accounts and by crediting the support

because there was a great disparity between their income earning capacity. Sharon's arguments have no merit. Whether Ronald paid Sharon the $10,000 from the joint bank accounts or the retirement income does not affect whether the credit was proper.

**46.** *Korn v. Korn*, 46 P.3d 1021, 1023 (Alaska 2002); *Johnson v. Johnson*, 836 P.2d 930, 934 (Alaska 1992); *Lewis v. Lewis*, 785 P.2d 550, 554 (Alaska 1990).

**47.** *Lewis*, 785 P.2d at 554.

lence proceeding. A superior court is not bound by a district court's support award: it has the discretion to recharacterize the interim money awarded to the parties once it has all the information on the parties' financial circumstances and needs.[48] In other words, the superior court can, after examining the full facts of the case, determine that the district court's interim support award was unjustified and treat the support money as marital property.

We interpret the superior court's statement that "it has the discretion to reallocate where necessary the monies awarded" by the district court as acknowledging its authority to recharacterize the district court's spousal support award. The superior court was implicitly exercising this power when it concluded that Sharon would receive $10,000, corresponding to her support payments, in the final distribution of the marital estate. It stated that this allocation was necessary "[i]n order to properly allocate the benefits received by the parties" because Ronald had paid Sharon the support in addition to paying the marital bills of the parties during the interim period. We do not believe this recharacterization was clearly unjust, and thus the superior court did not abuse its discretion when it treated the $10,000 Sharon received during the interim period as an advance against her share of the marital estate.

### 3. Equal distribution of the marital estate

The superior court, after considering the factors under AS 25.24.160(a)(4), found that equal division of the marital estate was appropriate. It found that both parties were of similar age, were in essentially similar eco-

nomic circumstances because Ronald's retirement income would be split equally, and would each have a home and a car. It also stated that Sharon had medical problems but found that they were not "of sufficient severity to warrant an unequal division of the marital estate."

Sharon argues that the superior court erred by failing to award her a larger share of the marital property. She argues that the superior court's division was unjust because she is in poor health and unable to work and because Ronald has a much greater income earning capacity than Sharon.

■ Because we are remanding the case for revaluation of the real property and the vehicles, the trial court will have to also make a new equitable distribution determination, and it is free to reevaluate all of its rulings in light of new evidence.[49]

### 4. Other arguments

Sharon also argues that the superior court abused its discretion in failing to require Ronald to return (in cash) $14,230 that he took from the parties' joint bank accounts after their initial separation in violation of the district court's protective order. The superior court found that it would have been inequitable to require Ronald to refund Sharon her half of the joint funds he withdrew from the parties' joint bank accounts because he used the funds to pay marital bills. Instead, the superior court included the $28,461 from the joint bank accounts with Ronald's assets in its calculations. The superior court therefore effectively increased Sharon's share of Ronald's TSP account by $14,230. In doing so, the superior court was exercising its discretion and "reallocat[ed] where

48. The superior court also has the ability to recharacterize as marital property interim spousal support that it awards if it finds that the initial award was unjustified. *Hanson v. Hanson*, 125 P.3d 299, 310 (Alaska 2005).

49. Sharon also argues that the superior court's finding that she was "economically viable and capable of self support" is clearly erroneous because it conflicts with the court's finding that she was "in poor health and unable to work." But these two findings are not necessarily mutually exclusive. The court found that Sharon was in poor health and unable to work and, to compen-

sate for this, included the pre-marital portion of Ronald's retirement as marital income. The court's finding that she was "economically viable and capable of self-support" was based on the court's final allocation of retirement income and the substantial size of the marital estate. Sharon received over $390,000 in assets and $1,700 a month in income. Given the sizable assets she received, the superior court did not clearly err in finding that 50% of the marital estate made Sharon "economically viable and capable of self support" even though she was "in poor health and unable to work."

necessary the monies awarded" by the district court. The superior court did not abuse its discretion in failing to require Ronald to pay Sharon half of the money he had taken in cash.[50]

 This is not to say that we condone Ronald's conduct in violating the district court's order and appropriating the money that the district court had awarded to Sharon. Ronald clearly circumvented the district court's order by removing cash from the bank account awarded to Sharon and intended for Sharon's support; in so doing he left her in a worsened cash flow position during the interim period while he had the benefit of his retirement income. Had Sharon filed a motion for interim attorney's fees under the circumstances, the superior court would have had compelling cause to grant that motion; it also would have acted within its discretion to order Ronald to return the appropriated funds to Sharon, or to require Ronald to show cause why he should not be held in contempt. Sharon did not file any such motion, and our resolution of the issue should be narrowly understood to mean only that the superior court did not abuse its discretion in declining to require Ronald to repay these funds as part of the court's final equitable distribution given that Ronald used these funds to pay marital debt.

Ronald argues that the superior court erred in granting Sharon's motion for $5,693.91 in credit for missing or damaged items without holding a hearing. But the record shows that Ronald did not request a hearing. He therefore waived his right to an evidentiary hearing.[51] The superior court did not err in granting Sharon's motion for credit for damaged or missing property without a hearing.

### D. The Superior Court Did Not Err In Failing To Award Sharon Attorney's Fees.

The superior court ordered each party to bear its own fees and costs, finding:

> Both parties were able to retain and utilize counsel throughout the case. Neither was disadvantaged in their ability to litigate this matter on an equal plane.... Each will be receiving a large sum of liquid funds through the allocation of [Ronald's] Thrift Savings Plan which will provide both with the ability to pay any remaining fees incurred in this matter.

Sharon argues that the superior court erred in failing to award her attorney's fees because it did not focus on the parties' economic circumstances and earning capacities. She argues that attorney's fees were warranted because Ronald has a greater earning capacity. She also argues that it was manifestly unreasonable for the court to expect her to liquidate her share of the TSP funds to pay her attorney's fees.

 The superior court has broad discretion in awarding attorney's fees in divorce cases.[52] An award of attorney's fees is meant to ensure that "both spouses have the proper means to litigate the divorce action on a fairly equal plane." [53] In exercising this discretion, the superior court must focus on the parties' relative economic situations and earning capacities.[54] A party's economic situation includes the divorce property division, and a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own fees.[55]

 The superior court did not abuse its discretion in not awarding Sharon attorney's

---

**50.** Even if the superior court abused its discretion by failing to order Ronald to pay the $14,230 in cash, Sharon's harm from the error is limited to the tax she would pay on withdrawing this sum from the pre-tax TSP retirement fund. Given the large size of the estate, the court's error, if any, was probably *de minimis.*

**51.** *DeNardo v. Maassen,* 200 P.3d 305, 315–16 (Alaska 2009).

**52.** *Carr v. Carr,* 152 P.3d 450, 457 (Alaska 2007) (citing *Sloane v. Sloane,* 18 P.3d 60, 64 (Alaska 2001)).

**53.** *Fernau v. Rowdon,* 42 P.3d 1047, 1059–60 (Alaska 2002) (quoting *Sanders v. Barth,* 12 P.3d 766, 768 (Alaska 2000)).

**54.** *Id.* at 1059.

**55.** *Tybus v. Holland,* 989 P.2d 1281, 1289 (Alaska 1999).

fees. Although there is some income disparity between Sharon and Ronald, Sharon received more than $100,000 in TSP funds and 50% of the marital property. The superior court explicitly found that Sharon was able to litigate the case on an equal playing field and nothing in the record indicates this finding is clearly erroneous. Sharon's share of the TSP funds is sufficient to pay her attorney's fees of approximately $20,000. It was not an abuse of discretion for the court to expect Sharon to utilize these funds to pay her attorney's fees.

Of course, because the case is being remanded for revaluation of property, the court will have to reevaluate its attorney's fees determination in light of the new property valuation evidence and its equitable distribution reevaluation.

## IV. CONCLUSION

We REVERSE the court's valuation of the parties' real property and vehicles, and REMAND for further proceedings. We AFFIRM the court's other orders as explained in our opinion.

CHRISTEN, Justice, dissenting in part.

CHRISTEN, Justice, dissenting in part.

I write separately to express my disagreement with the court's conclusion that the trial court abused its discretion by using the first trial date to value the parties' assets.

As the court notes, we held in *Ogard v. Ogard* that "the date of valuation ... should be as close as practicable to the date of trial."[1] In that case, the issue was whether to value property as of the parties' date of separation or as of the date of trial. Under the circumstances of this case, however, the principle articulated in *Ogard* simply begs the question of what we should consider the "date of trial": the first day of the initial trial, which was interrupted when the parties thought they had settled their case, or the date when the trial resumed, over a year later?

In my view, the court's decision to use the later date for valuation injects significant uncertainty into the already-challenging process of valuing property for distribution following divorce. Here, the downturn in the housing market took place over a period of months. But other types of significant marital assets, such as stocks or retirement plans, can gain or lose value much more quickly. The value of an asset can change by 15 percent—the threshold suggested by the court—in a matter of days. It is unclear how the superior court is expected to account for such rapid economic fluctuations under the court's holding. The court's opinion could prompt motions for revaluation of property in any trial spanning a period that, viewed in hindsight, marked the onset of an economic downturn.

Using the later of two trial dates to value property also undermines the possibility of settlement. If one party regrets entering into an as-yet-unmemorialized settlement agreement and is able to obtain a new appraisal suggesting the market value of an asset has changed by 15 percent or more, he or she will be free to allege disagreement about the settlement terms, file a motion to have the agreement set aside, and force the other party to reappraise the asset in preparation for a new trial. This will require the parties to relitigate at least a part of their original dispute, an expensive and time-consuming exercise.

We held in *Ogard* that "[a] valuation date should be chosen which will provide the most current and accurate information possible and which avoids inequitable results."[2] The experienced trial judge in this case was no doubt conscious of the potentially inequitable results of using a later valuation date; I am not persuaded that it was an abuse of discretion to use the first trial date to value the Stevens' marital estate.

For these reasons, I respectfully dissent from the portion of the court's decision that concludes the superior court abused its dis-

1. 808 P.2d 815, 819 (Alaska 1991).

2. *Id.* (quoting Lawrence J. Golden, Equitable Distribution of Property § 7.01, at 207 (1983)).