NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| B.M., | ) |
| | ) Supreme Court No. S-18138 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-06857 CI |
| v. | ) |
| | ) <u>MEMORANDUM OPINION</u> |
| R.C., | ) <u>AND JUDGMENT ON REHEARING*</u> |
| | ) |
| Appellee. | ) No. 2008 – January 24, 2024 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani R. Crosby, Judge.

Appearances: Lynda A. Limón and Randi R. Vickers, Limón Law Firm, Anchorage, for Appellant. R.C., pro se, Anchorage, Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

## I. INTRODUCTION

A divorcing couple had accumulated a substantial marital estate over their 20-year marriage. Following a lengthy trial and a series of reconsideration motions, the superior court divided the marital estate 57/43 in favor of the wife, ordered the wife to pay the husband an equalization payment, and ordered the husband to pay attorney's fees the wife incurred in an Internal Revenue Service (IRS) proceeding, as well as a significant portion of the fees she incurred in the divorce litigation itself.

The husband appeals the property division and fee awards. He challenges the court's valuation of his business; its allocation of a family cabin to the wife without according him a right of first refusal should she decide to sell it; its valuation of a jointly owned investment account and its recapture of some post-separation expenditures from that account; its allocation of a substantial tax debt; its consideration of the husband's historic underreporting of income, leading to the tax debt, as economic misconduct in the property division; its award to the wife of attorney's fees incurred in preparing her own defense to IRS collection proceedings; its overall division of the marital estate; and its award to the wife of attorney's fees incurred in the divorce litigation.

We affirm most aspects of the property division and the wife's award of attorney's fees for the IRS proceedings. We remand on one issue: whether an attorney's fees award for the divorce litigation was necessary to level the playing field in light of both parties' significant assets.

## II.    FACTS AND PROCEEDINGS

### A.    General Background

B.M. and R.C.[1] separated in 2016 after 20 years of marriage. R.C. filed for divorce that May. The ensuing years of litigation focused primarily on the division of the large marital estate.

R.C. worked in oilfield services before the marriage and during its first eight years, earning over $100,000 every full year she worked. In 2003 she resigned to care for the family.

At that point the couple's main source of income was a steel fabrication business B.M. founded in 1990, before the marriage. At the time of trial he still ran the business and owned 100% of its stock. The couple's reported income in 2012, 2013, and 2015 ranged from just shy of $250,000 to over $280,000 (in 2014 they reported a significant net loss). At the time of trial they also owned various residential properties,

---

[1]    We granted a request that the parties be identified by their initials.

including the marital home in Anchorage, condos in Anchorage, Girdwood, and Hawaii, and a house and cabin in Kenai. They jointly owned a number of bank, retirement, and investment accounts.

**B.    The Property Distribution Order**

A 20-day trial on the parties' property issues was held intermittently over nearly two years. In January 2020 the court issued a property spreadsheet showing its intended valuation and allocation of the property, at the same time putting on the record an oral explanation of its findings and conclusions and inviting the parties to move for reconsideration of any aspect of the tentative decision with which they disagreed.

The court decided a series of reconsideration motions, then issued its final judgment and a corrected and updated property spreadsheet in June 2021. The court's final division of the marital estate was 57/43 in R.C.'s favor, giving her approximately $3.8 million and B.M. approximately $2.9 million. R.C. was required to pay B.M. a roughly $214,000 equalization payment. The court also ordered B.M. to pay approximately $340,000 of R.C.'s attorney's fees, reasoning that her economic position was inferior to B.M.'s as a result of having to sell assets during the litigation to pay her attorney's fees and costs. When the equalization payment R.C. owed to B.M. was set off against the attorney's fees award he owed to R.C., B.M. owed R.C. $124,789.

B.M. appeals.

## III.   STANDARD OF REVIEW

"The division of property in a divorce action is a matter committed to the discretion of the trial court."[2]  "A trial court has broad discretion to provide for the equitable division of property between the parties in a divorce."[3] The equitable division process involves three steps:  "(1) deciding what specific property is available for

---

[2]    *Miller v. Miller*, 105 P.3d 1136, 1139 (Alaska 2005).

[3]    *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009), *as corrected on reh'g* (Alaska 2010).

distribution, (2) finding the value of the property, and (3) dividing the property equitably."[4]  "[T]he first step, '[t]he characterization of property as separate or marital[,] may involve both legal and factual questions.' "[5]  The second step, "[v]aluation of assets[,] 'is a factual determination.' "[6]  "[W]e review the superior court's legal conclusions de novo and its factual findings for clear error."[7]  Clear error exists "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[8]

"We review the trial court's third step, the equitable allocation of property, for an abuse of discretion."[9]  We may find that the trial court "abuses its discretion if it 'considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors.' "[10]

"A trial court has broad discretion to award attorney's fees in a divorce action, and we will not overturn such an award unless it is arbitrary, capricious, or manifestly unreasonable."[11]  We review awards of attorney's fees made under Alaska Civil Rule 82 for abuse of discretion.[12]  "[A]n award constitutes an abuse of discretion

---

[4]     *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021).

[5]     *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) (second alteration in original) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[6]     *Thompson v. Thompson*, 454 P.3d 981, 989 (Alaska 2019) (quoting *Engstrom*, 350 P.3d at 769).

[7]     *Engstrom*, 350 P.3d at 769.

[8]     *Aubert*, 483 P.3d at 186.

[9]     *Engstrom*, 350 P.3d at 769.

[10]     *Rohde v. Rohde*, 507 P.3d 986, 991 (Alaska 2022) (quoting *Thompson*, 454 P.3d at 995).

[11]     *Miller v. Miller*, 105 P.3d 1136, 1144 (Alaska 2005).

[12]     *Boiko v. Kapolchok*, 426 P.3d 868, 876 (Alaska 2018).

only when it is manifestly unreasonable."[13]  "The court enjoys 'broad discretion to award fees and to alter the amount it intends to award.' "[14]  However, "[w]hether the court applied the proper legal analysis to calculate attorney's fees is a question of law we review de novo."[15]  "When a[] [fee] award or enhancement 'calls into question [a party's] litigation conduct and the potential merits of [the party's] underlying . . . motions, we assess de novo the legal and factual viability of [the] motions and review relevant findings of fact for clear error.' "[16]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Clearly Err By Averaging High and Low Estimates To Reach The Steel Company's Value.

R.C. retained a business valuator and financial forensics accountant to calculate the value of the steel fabrication company and testify about it at trial. The accountant performed a "calculation of value" and provided the company's "going[-]concern value,"[17] calculated as of October 31, 2017.  He identified the high-end value as $1,753,261 and the low-end value as $824,679, for an average of $1,245,897.  He testified that providing a range of values was "more appropriate [than

---

**13**      *Id.*

**14**      *Id.* (quoting *Cizek v. Concerned Citizens of Eagle River Valley, Inc.*, 71 P.3d 845, 848 (Alaska 2003)).

**15**      *Kollander v. Kollander*, 322 P.3d 897, 906 (Alaska 2014) (alteration in original) (quoting *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010)).

**16**      *Boiko*, 426 P.3d at 874 (third, fourth, and fifth alterations in original) (quoting *Herring v. Herring*, 373 P.3d 521, 528 (Alaska 2016)).

**17**      The going-concern value is "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets.  Going-concern value includes, for example, goodwill."  *Value (going-concern value)*, BLACK'S LAW DICTIONARY (11th ed. 2019).

providing a single value] because there are some issues with the underlying data."[18] He described using the "calculation of value" approach as resulting in "a value that's more approximately right than precisely wrong."

For its initial property division spreadsheet, the court valued the steel company at the accountant's high-end going-concern value, $1,753,261. The court declined to order the business's dissolution, as B.M. had urged, reasoning that to do so would "severely reduce the value of the asset, and it would be . . . very detrimental to the marital estate."

B.M. moved for reconsideration, arguing that using the high-end going-concern value did not fairly take into account the economic effect of the divorce because it would force him to work past retirement age — unlike R.C., who could earn passive income by renting out the properties she was allocated in the divorce. The court agreed and decided instead to assign the business the average going-concern value, $1,245,897. The court allocated the business to B.M.

On appeal B.M. argues that the court erred by choosing the average value. For support he cites *Lundquist v. Lundquist*, in which divorcing spouses gave fishing gear values of $5,000 and zero, respectively, and the superior court averaged the two to reach a value of $2,500.[19] We held that this was an abuse of discretion because an average had no rational basis; the high estimate actually valued the gear whereas the zero estimate was based on the assumption that the gear's value was included in the

---

[18]    The accountant did not explicitly identify these "issues," but he noted in his testimony that he lacked some relevant documents. He said that the court had heard about some of these "issues" the day before, possibly referring to the testimony of an accountant R.C. had hired to investigate the steel company's finances. That accountant had testified about discrepancies between the steel company's QuickBooks data and what was shown on its tax returns.

[19]    923 P.2d 42, 53 (Alaska 1996).

appraisal of a vessel and therefore should not be considered separately.[20] Relying on *Lundquist*, B.M. asks us to "reject [the expert's] range value because it lacks a rational basis and [the expert] himself admits that he does not know the 'bullseye' figure."

But *Lundquist* does not require a "bullseye figure," nor does it foreclose averaging valuations in every case. Indeed, we explained in *Lundquist* that "[w]hen, for example, the parties obtain divergent appraisals of a piece of property, it may be appropriate to average those valuations."[21] R.C.'s forensic accountant testified specifically that the right answer was unknowable but fell somewhere in the range between high- and low-end going-concern values. The court's decision to select the average thus has a rational basis in the expert testimony and is not clearly erroneous.

B.M. also argues that the superior court failed to follow the prescribed method for valuing goodwill in a property division because it included the value of the steel company's goodwill in its overall valuation of the business without first determining whether that goodwill was marketable.[22] But B.M. did not raise this issue in the trial court, either when questioning experts or during the extensive post-trial motion work that resulted in significant modifications to the court's initial property

---

[20] *Id.*

[21] *Id.*

[22] In the context of business valuation, "goodwill" refers to the "business's reputation, patronage, and other intangible assets that are considered when appraising the business." *Goodwill*, BLACK'S LAW DICTIONARY (11th ed. 2019). We have held that goodwill should only be included in a business valuation "if the evidence suggests that it has value and is marketable." *Moffitt v. Moffitt*, 749 P.2d 343, 347 (Alaska 1988).

spreadsheet.[23]  We decline to address this evidence-based argument for the first time on appeal.[24]

> **B.  The Superior Court Did Not Abuse Its Discretion By Awarding The Kenai Cabin To R.C. Or By Denying B.M. A Right Of First Refusal.**

B.M. first asked the court to award him the Kenai cabin in a motion filed in November 2020 — more than nine months after the court issued its initial property spreadsheet awarding the cabin to R.C. and about five months after the court decided the parties' first round of reconsideration motions.  B.M. wrote in his November motion that the cabin had "significant sentimental value to [him and] he want[ed] it as a place for his children to hang out and for the boat launch rights it provides."  The court had already awarded B.M. the two-bedroom house nearby, but B.M. argued that he should be awarded the cabin as well because it "provides the room he needs for his children

---

[23]  B.M.'s counsel advised us at oral argument that she raised this issue on the cross-examination of R.C.'s accountant, when she asked him if his calculated value for the steel company beyond the business's liquidation value was goodwill, and "his response was in the affirmative, 'Yes.' "  The following exchange appears to be the only mention of goodwill in the trial transcript:

> [COUNSEL]:  [Operating assets] are included as part of your calculation report?
>
> [EXPERT]:  Yes.  So the numbers that they calculate for both the market and the income approach include both the tangible and intangible values.  So what you're talking about is the property; that's a tangible value.  The value that's over and above that, in this case $286,000, is the blue sky or the intangible or the *goodwill*, whatever you want to call it. [Emphasis added.]

This exchange could not reasonably have alerted either the superior court or R.C. to B.M.'s argument on appeal — that the business valuation had to distinguish between marketable and non-marketable goodwill.

[24]  *See Adkins v. Collens*, 444 P.3d 187, 195 (Alaska 2019) ("Arguments raised for the first time on appeal are generally waived, but those explicitly raised in the trial court may be expanded or refined in appellate argument." (footnote omitted)).

and guests and allows them to enjoy the harbor." The court denied B.M.'s request, noting that "[b]oth parties have spent time in Kenai over the years, and the court awarded each party a property in Kenai."

In a later motion for reconsideration, B.M. asked as an alternative that the court award him "the right of first refusal should [R.C.] decide to sell the Kenai cabin." While the motion was pending R.C. did, in fact, sell the cabin to help pay her legal fees. The court then "decline[d] to reconsider or clarify its prior order regarding the Kenai cabin."

B.M. argues that this was error. According to B.M., "award[ing] an asset that holds sentimental value to one party to the other is a decision that should be supported by some defensible rationale," something he asserts was lacking here. He cites *Odom v. Odom*, in which we held that the superior court had a defensible basis for awarding the marital home to the wife, despite the husband's sentimental attachment to it, because she would have custody of the children, and the marital home was the only home they had ever known.[25] B.M. argues that the superior court "had no such rationale" for awarding the cabin to R.C. and thus abused its discretion.

B.M.'s reading of *Odom* is too narrow. While we took note in *Odom* of the superior court's rationale for its award of the home, we also emphasized "the broad discretion of the superior court to determine how a marital asset should be allocated at trial."[26] *Odom* did not establish heightened fact-finding requirements for the allocation of certain property. Here, the superior court awarded the Kenai house to B.M. and the Kenai cabin to R.C. in its effort to equitably allocate a sprawling marital estate. Nothing indicates that the court considered improper factors, made an error of law, or based its

---

[25]    141 P.3d 324, 331-32 (Alaska 2006).

[26]    *Id.* at 332.

decision on clearly erroneous factual findings, and we have no reason to disturb its award of the cabin to R.C.[27]

B.M. argues in the alternative that the superior court should have given him a right of first refusal in the event that R.C. decided to sell the cabin. He argues that we upheld the award of the marital home to the wife in *Odom*, despite the husband's sentimental attachment to it, "in part because that sentimental attachment was adequately addressed by awarding the husband a right of first refusal should the wife choose to sell."[28] He invites us to "take the next step, and hold that where a property has significant sentimental value to one party, a refusal to protect that sentimental value with even a limited right of first refusal is an abuse of discretion."

We decline B.M.'s invitation. Assigning a right of first refusal to the husband in *Odom* was within the court's broad discretion, and declining to do so here was as well. We affirm the superior court's treatment of the Kenai cabin in the property division.

## C. Property Division Table

### 1. The superior court did not err in its valuation of the Charles Schwab account.

B.M. challenges several aspects of the superior court's treatment of the couple's joint Charles Schwab investment account: valuing it as of the date of

---

[27] We further note that B.M. wrote in his trial brief that he had "no objection to selling any or all" of the marital properties, including the Kenai cabin, "for fair market value," and that he failed to assert his sentimental attachment to the cabin until nine months after the court's initial allocation of it to R.C.

[28] *Odom*, 141 P.3d at 332, s*ee also Cox v. Floreske*, 288 P.3d 1289, 1294 (Alaska 2012) (acknowledging "that the opportunity to reclaim potentially sentimental property is a valid consideration" that may justify including right of first refusal in property division, but must be "weighed against" our strong policy in favor of disentangling interspousal affairs upon divorce).

separation, treating assets B.M. purchased with funds from the account as marital, and allocating the value of those assets to B.M. in the property division.

The account had a balance of $267,261 at the time of separation. R.C. proposed using this value for purposes of the property division, whereas B.M. proposed using its much-reduced value at the time of trial: $36,764. An accountant hired by B.M.'s attorney traced the post-separation withdrawals. Her analysis showed $50,000 withdrawn for the "Goldenview investment" in June 2016 and two withdrawals of funds used to purchase the "Elvis boat and trailer," the first for $25,000 in July 2016 and the second for $20,000 in January 2017.

The court decided to value the account as of the time of separation — $267,261 — and allocate it to B.M., who had controlled it during the lengthy divorce proceedings and used its funds without consulting R.C. In a motion for reconsideration B.M. argued that the court erroneously double-counted by valuing the Charles Schwab account at separation while also treating things purchased with its funds — the Goldenview investment and Elvis boat and trailer — as marital property. The court reasoned that valuing the account at separation was justified because B.M. controlled it and had "dissipated and wasted funds from" it, and that allocating the costs of the Goldenview investment and the Elvis boat and trailer to B.M. was equitable.[29]

Alaska Statute 25.24.160(a)(4)(E) instructs trial courts to consider "the conduct of the parties, including whether there has been unreasonable depletion of marital assets," when equitably dividing marital property. We have characterized "unreasonable depletion" — or dissipation — as the "(1) use of personal property for the spouse's own benefit, (2) at a time when the marriage is breaking down (either

---

[29]    The court noted that considering the six-figure growth that the account typically experienced, it was "fair to value the account at the date of separation and to value/allocate two assets purchased with proceeds of the account" that were worth $95,000 — less than the growth the account likely would have seen had B.M. not spent it down.

before or after separation), (3) with an intent to deprive the other spouse of the other's share of the marital property."[30]  "Not all of the identified elements need to be present in each case."[31]  "But if the superior court does find 'unreasonable depletion' . . . the proper remedy is to recapture the lost asset by valuing it at separation and crediting that value to the responsible party."[32]

The superior court acted in accord with AS 25.24.160(a)(4)(E) when it valued the Charles Schwab account at separation and credited that value to B.M. as the responsible party.[33]  The evidence tracing later withdrawals from the account to the Goldenview investment and the purchase of the Elvis boat and trailer supports the court's conclusion that B.M. used the account funds for his own benefit after the marriage had ended.  Although the court did not find an intent to deprive R.C. of marital funds, unreasonable depletion can be found despite the absence of one element.  And the court did find that B.M. purchased the Goldenview investment and the Elvis boat and trailer without R.C.'s knowledge or consent, suggesting that his motives were self-serving.  Having clearly found at least two elements of unreasonable depletion, the superior court properly valued the Charles Schwab account at the time of separation and assigned that value to B.M. as the responsible party.

The court likewise did not err when it used the value of the assets B.M. bought using the Charles Schwab funds as a rough estimate of the amount the account would have increased in value post-separation if B.M. had not spent it down.  The court

---

**30**     *Jones v. Jones*, 942 P.2d 1133, 1140 (Alaska 1997).

**31**     *Elliott v. James*, 977 P.2d 727, 733 (Alaska 1999); *cf. Jordan v. Jordan*, 480 P.3d 626, 632 (Alaska 2021) (holding that where two unreasonable depletion elements were not present, it was reasonable to decide there was insufficient evidence of unreasonable depletion).

**32**     *Rohde v. Rohde*, 507 P.3d 986, 993 (Alaska 2022) (quoting AS 25.24.160(a)(4)(E)).

**33**     *See id.*

noted on several occasions that the account had an impressive rate of return after separation, particularly in 2016 when the balance increased by $148,625 even though B.M. spent $125,767 of its funds. B.M.'s spending did eventually outpace the returns, as shown by the account's low value at the time of trial. The court reasoned that had B.M. spent nothing from the account during the separation, it would very likely have been worth more than $267,261 by the time of trial. But given the volatility and uncertainty of the stock market, the court — rather than attempt to project how the account would have grown absent B.M.'s depletion — allocated the value of B.M.'s purchases to B.M. in the property division table as a representation of the potential growth that was never realized.[34]

We conclude that this approach was a reasonable exercise of the court's discretion to equitably divide the marital estate under the circumstances.

> **2.    The superior court did not abuse its discretion by deciding that funds spent from the Charles Schwab account on the Post Road properties were dissipated.**

"Marital assets that are spent after separation for marital purposes or normal living expenses are not typically taken into account in the final property division."[35] "[R]ecapture is inappropriate" when a marital asset is used for marital purposes or normal living expenses.[36] Therefore, although trial courts have broad discretion when dividing marital property, an order of recapture requires findings of fact, supported by evidence, "that the assets in question were actually wasted,

---

[34]    We note, as the superior court did, that this method of valuing the account's lost interest gains likely benefitted B.M. In a single year the account usually gained around six figures, whereas the court selected approximately $95,000 as the hypothetical lost gains.

[35]    *Day v. Williams*, 285 P.3d 256, 264 (Alaska 2012) (quoting *Partridge v. Partridge*, 239 P.3d 680, 692 (Alaska 2010)).

[36]    *Brandal v. Shangin*, 36 P.3d 1188, 1195 (Alaska 2001).

dissipated, or converted to non-marital form."**37** "A superior court errs when it recaptures property without making specific findings of fact as to waste or dissipation."**38**

In a submission on joint income and expenses, B.M. asserted that he used funds from the Charles Schwab account to maintain marital property — including the Post Road properties associated with the steel company — following the parties' separation. The court, in its oral decision on the record, declined to give him credit for these expenditures, explaining (as noted above) that B.M. "had sole control of [the steel company] post-separation, and [R.C.] did not receive any income or benefit from its operations," and "to the extent that [B.M.] used marital funds to operate or otherwise assist [the steel company], he did so without [R.C.'s] consent."

B.M. argues that the superior court erred when it treated such expenditures as dissipated (because spent for his personal benefit) rather than unavailable for recapture (because spent to maintain marital property). He argues that valuing the Charles Schwab account as of the date of separation recaptured a significant amount of funds appropriately spent during separation to maintain marital property and was therefore error.

We initially agreed that the superior court's dissipation analysis appeared incomplete. On R.C.'s petition for rehearing, however, we have determined that the court's original decision — that B.M.'s post-separation expenditures from the Charles Schwab account for the steel company should not be considered as benefitting the marital estate — is supported by the evidence and sufficiently explained for purposes of appellate review.

---

**37** *Ethelbah v. Walker*, 225 P.3d 1082, 1090-91 (Alaska 2009).

**38** *Day*, 285 P.3d at 260.

In an order granting reconsideration in part of its oral order, the superior court invited B.M. to "identify and provide documentation for" expenses related to the rental properties if he did not believe they had already been properly accounted for. The court held an evidentiary hearing in November 2020 with several express purposes, one of which was to "take evidence on income/expenses associated with the properties controlled by each party since separation through the end of 2019." Exhibits and testimony specifically addressed the use of marital funds for the maintenance of the rental properties. In its written order issued two months later, the court acknowledged that B.M. had "paid a number of expenses relating to the Post Road properties" from the Charles Schwab account but reiterated its finding that the account was properly valued as of the time of separation because B.M. "had dissipated or wasted that asset"; it declined R.C.'s request that B.M. "pay her half of the amount expended from that account," concluding that valuing it at the time of separation sufficiently accounted for B.M.'s post-separation expenditures. This was the court's final order involving the complicated balancing of the parties' different claims to income and expenses, and it clearly included B.M.'s claimed expenses for the rental properties in its calculus.

In sum, the court's oral findings in support of its dissipation analysis — that B.M. controlled the steel company after separation, that R.C. received no benefit from its operations, and that B.M.'s use of marital funds for the company's benefit was done without R.C.'s consent — all find support in the evidence. Subsequent proceedings did not cast doubt on these findings but rather confirmed the extent to which B.M.'s use of the account benefited him personally rather than the marital estate. The court did not abuse its discretion in its treatment of the funds expended from the Charles Schwab account on the rental properties.[39]

---

[39] B.M. makes two additional arguments about the court's property spreadsheet: that the court erred by not including his credit for general marital expenses

**D.     The Superior Court Did Not Abuse Its Discretion When It Allocated 100% Of The Tax Liability To B.M.**

The property division was complicated significantly by B.M.'s underreporting of the steel company's income to the IRS in the years leading up to separation.  A forensic accountant R.C. hired early in the divorce proceedings discovered the underreporting and later testified about it at trial.  He found that the revenue shown in the company's QuickBooks records exceeded that reported to the IRS by nearly a million dollars in 2014 and 2015, and he described the discrepancies as "deliberate omissions."  With the assistance of his own forensic accountant, B.M. filed amended tax returns for 2012, 2013, 2014, and 2015 in late 2018.  At the time of trial, however, the tax debt totaled $442,302.

In its initial property division following trial, the court did not treat the unpaid taxes as marital and did not factor them into the division, explaining that it thereby hoped to avoid an appearance that R.C. was equally responsible for the underpayment.  But on B.M.'s motion for reconsideration, the court agreed that *Perry v. Perry* requires including tax debt as marital debt "even when 'one spouse is unaware

---

in the amounts subject to division and by awarding dollar amounts that are approximately $7,700 off the court's intended 57/43 split.  B.M. had the opportunity to raise his first point before the trial court and failed to do so; it is therefore waived.  *See Wells v. Barile*, 358 P.3d 583, 589 & n.17 (Alaska 2015) (explaining that arguments "not timely raised below" are waived).

The latter point appears to be correct, though the amount is *de minimis* relative to the size of the marital estate.  We leave it to the superior court's discretion whether to address it on remand.  *See Rohde v. Rohde*, 507 P.3d 986, 995 n.30 (Alaska 2022) (noting *de minimis* nature of claim that $100 asset was mistakenly allocated but noting that remand focused on value of major asset did "not preclude the court from reconsidering . . . more minor aspects of the property division").

of the debts.' "[40]   The court added the unpaid taxes to the property spreadsheet and allocated the entire amount to B.M.

B.M. argues that this decision involved two errors.  First, he argues that the court erred by treating the tax debt as his individual debt "even though it was owed on income the Superior Court recognized was marital."  This argument fails because its factual premise is incorrect; the court ultimately did *not* treat it as B.M.'s individual debt, instead designating it as marital property on B.M.'s motion for reconsideration.

At oral argument, however, B.M. contended that the court negated the debt's marital-property designation when it increased R.C.'s share of the marital estate from 54% to 57% to "correct" for any losses she would suffer as a result of the court's decision to treat the debt as marital.  The court explained why it did this:

> In the court's decision, it allocated 54% of the marital estate to [R.C.] and 46% to [B.M.].   Anticipating [B.M.'s] objection to not including the tax debt in the 90.1 table, the court explained that doing so would result in a 57/43 percentage split in [R.C.'s] favor.  Put differently, the court made clear that a 57/43 division was fair and equitable under the facts of this case.  The court continues to believe so.

The court thus changed the overall property division to keep it in line with what it believed to be equitable under the circumstances; this was within its discretion.

B.M.'s second argument is that the court punished him three times over for underreporting the steel company's income when it allocated the entire debt to him, factored his underreporting into the property division as relevant conduct, and awarded R.C. attorney's fees she incurred because of the unpaid taxes.  But while these actions all addressed the same conduct, they did so in separate steps — allocating the property, dividing the overall estate, and determining whether to award attorney's fees — and they did so appropriately.

---

[40]   449 P.3d 700, 704 (Alaska 2019) (quoting *Stanhope v. Stanhope*, 306 P.3d 1282, 1290 (Alaska 2013)).

B.M.'s argument to the contrary relies on three decisions in which we "cautioned [s]uperior [c]ourts against double[-]counting": *Hartland v. Hartland*,[41] *Jones v. Jones*,[42] and an unpublished opinion, *Berg v. Berg*.[43] In each of these decisions the challenged "double[-]counting" involved the recapture of a dissipated asset, followed by an adjustment to the property division *because of* the dissipation.[44]

But the tax debt was not a recaptured dissipated asset. Recapturing a dissipated asset restores the marital estate to what it *would have been* had the party who dissipated the asset not done so. On the other hand, including a marital debt in the estate serves to bring the estate as a whole closer to its economic reality: part of the estate's value is owed elsewhere. The allocation of the debt to B.M. simply meant that he was responsible for ensuring that it was paid. Regardless, he received 43% of the marital estate, which was the value of marital assets minus marital debts. Allocating the debt to B.M. was not a "punishment" but rather a necessary step in allocating marital property. The court acted within its discretion when it allocated the tax debt to B.M.

### E.     The Property Division Was Not Excessively Punitive.

B.M. argues that the 57/43 property division favoring R.C. was inequitable, was "excessively punitive" toward him, and failed to fairly allocate the

---

[41]     777 P.2d 636 (Alaska 1989).

[42]     942 P.2d 1133 (Alaska 1997).

[43]     No. S-16114, 2018 WL 3954006 (Alaska Aug. 15, 2018).

[44]     *See Hartland*, 777 P.2d at 643 (cautioning the superior court not to "double[-]count" on remand; "that is, recapture dissipated assets and make a preferential award to [the non-dissipating spouse] because assets have been dissipated"); *Jones*, 942 P.2d at 1141 (instructing the superior court to "be on guard not to 'double[-]count' " on remand; "[t]hat is, it should not recapture the gambling losses and credit them to [the dissipating spouse's] account and then also make a preferential division of the marital property in favor of [the non-dissipating spouse] because of any waste of assets that it found"); *Berg*, 2018 WL 3954006, at *4 (remanding a property division where the superior court had "simultaneously recaptured the value of the wasted assets and factored them into its equitable division").

economic effect of the divorce.  He contends that the court abused its discretion by charging him the full tax debt for the underreported income, recapturing the value of the Charles Schwab account at separation, and ordering him to pay $339,252 of R.C.'s attorney's fees.  He asserts that the court's decision to use the steel company's going-concern value rather than its liquidation value "essentially prohibits [B.M.] from retiring or forces him to absorb an economic loss of $959,897 — the difference between the court's value of $1,245,897 and the liquidation value of $286,000."  The essence of B.M.'s argument is that the superior court weighed the *Merrill* factors incorrectly by assigning too much weight to his conduct and R.C.'s income capacity and not enough to his age and "imminent need for retirement," resulting in a property division that was " 'clearly unjust' and an abuse of discretion."[45]

The equitable division process begins from "[t]he starting presumption . . . that an equal division is the most equitable."[46]  But " '[t]he superior court may divide the [estate] unequally if it finds that such a division is just after considering' 'the *Merrill v. Merrill* factors now codified in AS 25.24.160(a)(4).' "[47]  Those factors are:

> (A) the length of the marriage and station in life of the parties during the marriage;
> (B) the age and health of the parties;
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
> (D) the financial condition of the parties, including the availability and cost of health insurance;

---

[45]     *See Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962) (identifying "the principal factors to be considered by the trial court in determining the question of . . . division of property," including "the respective ages of the parties; their earning ability; [and] the . . . conduct of each during the marriage").

[46]     *Dunmore v. Dunmore*, 420 P.3d 1187, 1193 (Alaska 2018).

[47]     *Fletcher v. Fletcher*, 433 P.3d 1148, 1154 (Alaska 2018) (second alteration in original) (quoting *Hooper v. Hooper*, 188 P.3d 681, 686 (Alaska 2008)).

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division. [48]

"[T]he trial court need not make findings pertaining to each factor, but its findings must be sufficient to indicate the factual basis for the conclusion reached."[49] "[O]ur case law clearly establishes that the superior court has significant discretion 'to ascribe different weights to [the *Merrill*] factors upon hearing the evidence at trial.' "[50]

When the superior court issued its oral decision and its first version of the property spreadsheet, it considered the *Merrill* factors in reaching what it determined to be an equitable division of the marital estate. As noted above, the court divided the estate 54/46 in R.C.'s favor, later adjusting the percentages to 57/43 after adding the tax debt to the property spreadsheet.

The court found that the parties' marriage was "a long-term marriage of approximately 20 years." It noted that R.C. was about five years younger than B.M. and that neither party had any "real significant health concerns." The court explained that R.C. would keep the family home. The court apparently found determinative R.C.'s inferior earning capacity, B.M.'s conduct, and R.C.'s lack of affordable health insurance until becoming eligible for Medicare.

---

**48**      AS 25.24.160(a)(4).

**49**      *Fletcher*, 433 P.3d at 1155.

**50**      *Jerry B. v. Sally B.*, 377 P.3d 916, 938 (Alaska 2016) (quoting *Cartee v. Cartee*, 239 P.3d 707, 715 (Alaska 2010)).

B.M. argues that the court assigned too much weight to the parties' relative earning capacities. The court noted that R.C. had been "out of the workforce for an extended period of time" whereas B.M. ran the steel company, a business with "demonstrated . . . profitability," and concluded that "[R.C.] doesn't have a similar situation where she's able to continue generating a substantial income." As B.M. points out, R.C. did receive a number of income-generating assets as part of the property division. But even considering these assets, the court's conclusion that B.M. is better positioned to earn a higher income than R.C. is supported by the evidence. Awarding her a larger percentage of the marital estate in partial reliance on this factor is not clearly unjust and was well within the court's discretion.

The court also gave weight to the parties' access to health insurance, particularly the fact that R.C. would have to wait longer than B.M. to become eligible for Medicare. This was also an appropriate consideration under AS 25.24.160(a)(4)(D). We see no clear error in the court's factual finding on the availability of health insurance and nothing manifestly unreasonable about giving some weight to this *Merrill* factor.

The court also placed B.M.'s conduct, particularly his underreporting of the steel company's income, on the scales. Alaska Statute 25.24.160(a)(4) requires that property be divided "without regard to which of the parties is in fault," but at the same time the statute instructs courts to consider the conduct of the parties.[51] We have therefore construed the term "fault" as used in subsection .160(a)(4) as referring to moral or legal misconduct that leads to the breakdown of the marriage, but not to economic misconduct that unreasonably depletes marital assets.[52] "The concept of economic misconduct is broad enough to include social or moral misconduct which

---

[51] AS 25.24.160(a)(4)(E).

[52] *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997); *see also Hartland v. Hartland*, 777 P.2d 636, 642 (Alaska 1989).

leads to an unreasonable depletion of marital assets, such as domestic violence."[53] Therefore, when equitably dividing property, a court may consider economic misconduct under AS 25.24.160(a)(4)(E) but may not weigh "a party's moral or legal marital failings which do not amount to economic misconduct."[54]

The superior court here properly disregarded conduct that might have led to the breakdown of the marriage and considered only factors permitted by AS 25.24.160(a)(4). In its initial distribution, when the court left the unpaid taxes off of the property spreadsheet, the court explained that if it had "assigned the tax debt associated . . . with this underreporting to the marital estate, there would have been an unreasonable depletion of the assets, but I've not done that." The court focused instead on B.M.'s objectionable behavior during the litigation, which included violating discovery rules and unilaterally using marital funds without a court order, thus increasing R.C.'s legal fees. When the court later added the tax debt to the marital estate and increased R.C.'s share of the estate from 54 to 57%, it did so because of B.M.'s conduct in underreporting the steel company's income. The court thus recognized two different areas of economic misconduct that fall within the scope of

---

[53] *Jones*, 942 P.2d at 1139 (citing BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 8.09, at 600 (2d ed. 1994)).

[54] *Id.*

AS 25.24.160(a)(4)(E): vexatious litigation[55] and unreasonable depletion of marital assets.[56]

Including B.M.'s conduct in underreporting the steel company's income in this analysis was not impermissible double-counting because the court considered the equities of this conduct only once: when it equitably divided the marital estate in accordance with AS 25.24.160(a)(4). The court's allocation of the tax debt to B.M.[57] was not equitable in nature because it did not relieve R.C. of the obligation; it merely ensured that B.M. was responsible for making sure it was paid, as he was in a better

---

[55] We have not previously explained whether vexatious litigation practices may be considered "economic misconduct." In *Heustess v. Kelley-Heustess* we did remand a property division order for the superior court to consider the division without taking into account the party's vexatious litigation, but we came to that conclusion because the superior court had impermissibly double-counted this conduct by including it in both its property division analysis and its order for enhanced attorney's fees. *See* 259 P.3d 462, 476-77 (Alaska 2011). Here, in contrast, the superior court explicitly declined to consider B.M.'s litigation conduct in its attorney's fees award. Our concerns in *Heustess* regarding whether vexatious litigation may be considered under an AS 25.24.160(a)(4)(E) analysis are therefore not relevant here.

The purpose of AS 25.24.160(a)(4) is to "fairly allocate the economic effect of divorce." When the unreasonable conduct of one party to a divorce unnecessarily prolongs litigation, increasing the other party's legal fees above what should be necessary to end the matter, it may be necessary for the superior court to consider this vexatious conduct to achieve the statutory purpose. Vexatious litigation is not the sort of "moral or legal marital failing[]" we instructed courts to refrain from considering in *Jones*. *See* 942 P.2d at 1139. Rather, it is misconduct that may place economic burdens on another party, potentially interfering unjustly with that party's ability to litigate. Vexatious litigation conduct is therefore properly considered under AS 25.24.160(a)(4)(E), so long as the court does not double-count this conduct in ordering enhanced attorney's fees. *See Heustess*, 259 P.3d at 477.

[56] While the payment of the overdue taxes themselves did not unreasonably deplete the marital estate, as they were owed regardless of B.M.'s conduct, the interest owed as a result of B.M.'s failure to pay the taxes on time and in full did.

[57] *See* discussion *supra* Section IV.D.

position to do so. And the award of attorney's fees to R.C. for her innocent spouse defense was compensatory.[58] There was no impermissible double-counting.

As explained above, the court's finding of economic misconduct is supported by the record, and the court appropriately considered it when equitably dividing the property. Seeing nothing manifestly unjust about the property division, we reject B.M.'s contention that it was excessively punitive.

**F.  The Award Of Attorney's Fees To R.C. For Her Innocent Spouse Defense Was Within The Superior Court's Inherent Authority To Enforce Its Decrees.**

By mid-2019 B.M. had paid much of the debt owed for the steel company's unpaid taxes. But by May 2020 he still owed over $44,000 in principal and interest. When he stopped making payments, the IRS turned to R.C. She moved in superior court for an order compelling B.M. to pay off the tax debt no later than June 8, at which point she would have to begin preparing her "innocent spouse" defense for an IRS hearing scheduled for July 9. On June 15 the court granted the motion and ordered B.M. to notify R.C. immediately, via counsel, whether he would pay the entire amount due by June 24. The order further advised that if he failed to pay, and if R.C. was unable or unwilling to pay, R.C. could "keep track of attorney's fees incurred in presenting her innocent spouse defense" at the IRS hearing and the court would later consider a motion that B.M. "pay part or all of the fees incurred in presenting her defense."

On June 25 B.M. notified the court that he had complied with the order and paid the remaining tax debt. He attested that he had "notified [R.C.] directly of his intent to pay the IRS debt by June 19," "mailed the checks to the IRS on June 24," and "provided proof to [R.C.] directly of the payment that same day . . . with pictures of the checks and envelope." B.M. attached as an exhibit photos of two checks and a USPS priority mail envelope addressed to "IRS – Ogden, Utah."

---

[58]  *See* discussion *infra* Section IV.F.

But R.C. notified the court that B.M. had not complied with the order, asserting that he had missed the June 24 payment deadline. R.C. had asked that B.M. either pay the IRS debt electronically or deliver the checks to her attorney's office so they could be forwarded to the appeals officer. B.M. did neither, according to R.C., putting the checks in the mail instead. R.C. also alleged that B.M. sent the checks to the wrong IRS location, failed to use a complete mailing address, and forgot to include the tax years in the memo line of each check — all mistakes R.C. and her counsel feared would prevent the balance from actually being credited to the couple's account before the July 9 hearing. According to R.C., because B.M. "only pretended" to pay off the IRS debt, she still had to participate in the hearing, at which an IRS appeals officer gave her until July 27 to prepare her innocent spouse defense.

R.C. next filed a motion asking the court to award her $11,522 in attorney's fees incurred preparing her innocent spouse defense. R.C.'s attorney attested in an affidavit accompanying the motion that she had decided it was necessary to begin preparing the defense in mid-July to be ready for the July 27 hearing. The attorney explained that they "ran out of time to wait and see" whether B.M. had paid off the balance.

On August 12 B.M. filed a supplemental notice informing the court that the IRS had processed electronic payments he made and that the balance was paid off. He included a screenshot from the IRS website showing that the payments had been processed.

The court then granted R.C.'s motion for attorney's fees related to her innocent spouse defense. The court appears to have relied primarily on Alaska Civil Rule 82, which allows fee awards to prevailing parties in civil litigation. Concluding that the Rule "could apply" to this circumstance, the court noted further that it could "vary the standard award of 20% of reasonable attorney's fees . . . by considering the factors set forth in Rule 82(b)(3), such as vexatious or bad faith conduct, and other equitable factors." The court summarized what it deemed to be B.M.'s vexatious

conduct, particularly his delay in paying by check and then his further delay in paying electronically when it could not be confirmed that the IRS had received the checks, all while R.C. was preparing for the upcoming IRS hearing on her innocent spouse defense.

B.M. argues that the court committed plain error by awarding these fees under the prevailing party standard of Rule 82, reasoning that "[R.C.] was not a prevailing party in the [IRS proceeding] for the excellent reason that the [IRS proceeding] was never held because [B.M.] paid the tax liability." He also asserts that "it is plain error to award fees under Rule 82 for conduct outside the litigation in which the fees were awarded." According to B.M., the court erred by basing the fee award on his vexatious conduct in threatened litigation with the IRS rather than on his conduct in the divorce case, violating the rule that it "may not consider 'actions taken during the underlying transaction or other litigation between the parties.' "[59] Lastly, he asserts that the court's error went beyond just considering his conduct outside the divorce litigation; it was made worse by considering conduct in litigation between different parties, R.C. and the IRS.

We agree with B.M.'s argument that neither Rule 82 nor the divorce exception to the Rule clearly applies here. But the superior court has the inherent power to issue orders enforcing property divisions and divorce decrees, and we review those orders for abuse of discretion.[60] We affirm the court's award of attorney's fees for R.C.'s preparation of her innocent spouse defense as a permissible exercise of the court's broad discretion in this area.

---

**59**     B.M. is quoting *Riddle v. Lanser*, 421 P.3d 35, 49 (Alaska 2018) (quoting *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 145 (Alaska 2004)).

**60**     *Beal v. Beal*, 88 P.3d 104, 111 (Alaska 2004); *Horchover v. Field*, 964 P.2d 1278, 1283-84 (Alaska 1998) ("[T]he superior court has inherent power, and also the duty to enforce its divorce decrees." (quoting *Cedergreen v. Cedergreen*, 811 P.2d 784, 786 (Alaska 1991))).

By this point in the litigation the superior court had allocated the tax debt to B.M. and ordered him to inform R.C. by June 19 whether he intended to pay the debt, and then either pay the remaining balance by June 24 or else risk being later ordered to pay the attorney's fees R.C. incurred for her innocent spouse defense or to compensate her should she pay the debt herself. R.C. incurred the attorney's fees in an effort to avoid having that burden shifted to her in contravention of the court's orders. It was within the court's enforcement authority to then award R.C. the fees she incurred in her attempts to ensure compliance with both the court's property division and its order that B.M. pay the tax debt by a certain date so that R.C. could avoid unnecessary litigation expenses. Regardless of the framework the court used as the basis for its award, we see no abuse of discretion in its exercise of this inherent authority.

**G. It Was An Abuse Of Discretion To Order B.M. To Pay R.C.'s Attorney's Fees For The Entire Case.**

Because there is no prevailing party in a divorce case, the superior court must award fees "on the basis of the 'relative economic situations and earning powers of the parties, rather than on the prevailing party standard of Civil Rule 82.' "[61] The divorce exception to Rule 82 "is meant to assure that both spouses have the means to litigate on an equal footing."[62] "[W]hen the parties' economic status is generally equal, it is ordinarily error to make any award of costs or fees."[63] In the context of awarding fees, "a party's economic situation includes more than simply earning power; the property division itself is relevant. . . . In particular, we have stressed that a party who

---

[61] *Rosenblum v. Perales*, 303 P.3d 500, 508 (Alaska 2013) (footnotes omitted) (quoting *Bergstrom v. Lindback*, 779 P.2d 1235, 1238 (Alaska 1989)).

[62] *Id.*

[63] *Berry v. Berry*, 277 P.3d 771, 779 (Alaska 2012) (alteration in original) (quoting *Edelman v. Edelman*, 61 P.3d 1, 5 (Alaska 2002)).

receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own attorney's fees."[64]

The court ultimately ordered B.M. to pay $339,252 of R.C.'s attorney's fees. The court awarded these fees "based on [R.C.]'s economic situation, which is less favorable than [B.M.]'s as a result of [R.C.] selling separate as well as marital assets during the course of the litigation to pay for attorney's fees and costs." The court explained that "[B.M.] remains in the position the court's property division placed him" because he could pay his fees out of the steel company's revenues, whereas R.C.'s "overall financial position is weaker than the court intended it to be when allocating property due to litigation." The court declined to enhance the fee award based on bad faith or vexatious conduct even though it was "inclined to agree with [R.C.]" that some of B.M.'s conduct during the litigation would justify such an enhancement.[65]

The proper focus of the court's attorney's fees analysis under the divorce exception is not, however, whether the costs of litigation have made one spouse's financial position weaker than the court anticipated when dividing the property; rather, the court must ask whether the spouse received enough assets that she could reasonably be expected to cover her own fees. In *Stevens v. Stevens* a divorcing spouse argued that it "was manifestly unreasonable for the court to expect her to liquidate her share of the [thrift savings plan] funds to pay her attorney's fees."[66] We did not accept her argument, holding instead that it was not an abuse of discretion to expect her to use

---

[64] *Tybus v. Holland*, 989 P.2d 1281, 1289 (Alaska 1999) (footnotes omitted); *see also Davila v. Davila*, 908 P.2d 1027, 1035 (Alaska 1995) (holding that even though wife earned less than husband it was not error to require her to pay her own fees from a large property settlement).

[65] *See Berry*, 277 P.3d at 779-80 (describing process for enhancing attorney's fee award in divorce action based on other spouse's misconduct).

[66] 265 P.3d 279, 290 (Alaska 2011). The wife received more than $100,000 of thrift savings plan funds and incurred attorney's fees of approximately $20,000. *Id.* at 291.

those funds for that purpose even though there was "some income disparity between" the parties.[67] In *Siggelkow v. Siggelkow* the wife was awarded attorney's fees despite having a higher income than her husband; he received more property (albeit encumbered) in the property division.[68] We concluded that because the wife "received a substantial property award from which she could have paid her attorney's fees," the attorney's fees award was an abuse of discretion.[69]

The attorney's fees R.C. incurred in this lengthy litigation were high, but so is the value of the marital estate. R.C.'s 57% of it carried a value of $3,830,327 and included seven real properties with income-generating potential (in addition to the marital home), vehicles, a variety of personal property, a sheep hunting permit valued at nearly $150,000, and more than $450,000 in liquid assets. As separate property R.C. retained a residential property she had brought into the marriage and a retirement account valued at over $1 million. The fact that she sold marital assets such as hunting permits, a gun collection, and a boat slip, together worth over $339,000, is evidence that she received "a property settlement sufficient to cover incurred attorney's fees"[70] — not evidence that she could not afford to litigate with B.M. on a fairly equal plane.

Absent a finding that R.C.'s financial position was so inferior to B.M.'s that she lacked "the means to litigate on an equal footing,"[71] the substantial attorney's fees award was manifestly unreasonable. We vacate the award so that the court can reconsider on remand whether any award of attorney's fees is necessary.

---

[67]   *Id.* at 290-91.

[68]   643 P.2d 985, 989 (Alaska 1982).

[69]   *Id.*

[70]   *See Stevens*, 265 P.3d at 290.

[71]   *Rosenblum v. Perales*, 303 P.3d 500, 508 (Alaska 2013).

## V. CONCLUSION

We VACATE the award of R.C.'s attorney's fees for the entire case and REMAND to the superior court for reconsideration consistent with this opinion. In all other respects the superior court's division of the marital property is AFFIRMED.**[72]**

---

**[72]** A brief aside on professionalism: It is the appellant's responsibility to arrange for the preparation of all parts of the trial court transcript "which are essential to a determination of the issues on appeal." Alaska R. App. P. 210(b). The court system provides clear and easily accessible instructions in its *Manual of Transcript Procedures*. ALASKA COURT SYSTEM, MANUAL OF TRANSCRIPT PROCEDURES (2023), https://public.courts.alaska.gov/web/forms/docs/tf-410.pdf. The transcripts provided in this matter fell far short of what we expect; they lacked any semblance of organization or sequential pagination across their many volumes.